**Electronically Filed
Intermediate Court of Appeals
29851
31-JAN-2013
08:27 AM**

NO. 29851

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


FRANCISCO ABADILLA, JR., Plaintiff-Appellant
v.
SANFORD IWATA; JOHN DOES 1-10; JANE DOES 1-10;
DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10;
DOE ASSOCIATIONS 1-10; DOE JOINT VENTURERS 1-10;
DOE TRUSTS 1-10 and DOE GOVERNMENTAL ENTITIES 1-10,
INCLUSIVE, Defendants-Appellees.


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 07-1-36)


MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Foley and Fujise, JJ.)


Plaintiff-Appellant Francisco Abadilla, Jr. (Abadilla) was injured at work after a machine used to crush rocks "exploded" and parts from the machine struck him in the stomach. Abadilla sued his co-employee Defendant-Appellee Sanford Iwata (Iwata), who was the president and general manager of the company that employed Abadilla, seeking compensatory and punitive damages. The Circuit Court of the Third Circuit (Circuit Court)[1] granted summary judgment in favor of Iwata on all counts asserted against Iwata in Abadilla's First Amended Complaint.

Under Hawai'i's workers' compensation law, an employee is precluded from suing a co-employee for injuries caused by

---

[1] The Honorable Greg K. Nakamura presided.

negligence, but can sue a co-employee for injuries caused by wilful and wanton misconduct. The principal issue in this appeal is whether there were genuine issues of material fact regarding whether Abadilla's injuries were caused by Iwata's wilful and wanton misconduct. As explained below, we conclude that the answer to this question is yes. We further conclude that there were genuine issues of material fact with respect to Iwata's punitive damages claim. Accordingly, we hold that the Circuit Court erred in its grant of summary judgment in favor of Iwata on Counts I, III, and V of the First Amended Complaint, which Abadilla challenges on appeal. We vacate the entry of judgment against Abadilla on Counts I, III, and V, and we remand the case for further proceedings.

BACKGROUND

I.

In reviewing a trial court's grant of summary judgment, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion." Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (block quote format and citation omitted). We therefore present the evidence submitted in connection with Iwata's motions for summary judgment in the light most favorable to Abadilla.

A.

Abadilla was employed by Sanford's Service Center, Inc. (SSC) as an equipment operator. SSC operated a rock quarry on the Big Island and was in the business of supplying gravel, cinder, and soil. Iwata was the president and general manager of SSC and a co-employee of Abadilla. Iwata's duties included serving as a supervisor, mechanic, job estimator, laborer, trainer, safety compliance officer, equipment operator, and driver. Iwata was responsible for safety training and compliance and took care of "most of the maintenance and the field work." As the operator of a rock quarry, SSC was governed by federal

2

Mine Safety Health Administration (MSHA) regulations, and Iwata held a mining training certificate.

As part of its business, SCC owned and used a Cedarapids Horizontal Rotor Secondary Impactor (Impactor) to crush larger rocks into smaller rocks or aggregate. Abadilla was trained by Iwata regarding the maintenance of the Impactor. The Impactor crushed rocks as follows: Rocks were fed by a chute into the inner chamber of the Impactor, which contained a rotating impeller shaft to which metal bars were attached. The metal bars (also known as "blow bars") attached to the rotating impeller would hit the rocks against fixed breaker plates causing the rocks to fracture into smaller pieces. The metal bars were held in place with wedges or chocks designed to prevent them from coming out during operation. The chamber was lined with high-chrome tiles that were bolted down. While in operation, the cover to the chamber was kept closed by hydraulic cylinders and multiple locks.

B.

During a prior incident which occurred several months before Abadilla sustained his injuries (hereinafter, the "prior malfunction incident"), the Impactor malfunctioned and "exploded," causing major damage to the Impactor. On that occasion, Abadilla was loading cinder onto a truck and another employee named Fernando was operating the Impactor. After the explosion, Abadilla observed that the cover to the Impactor had opened up, and that pieces of the bar assembly were "all over the place." Jack Lee (Lee), an employee of SSC, believed that the explosion occurred when one of the blow bars "got loose" in the Impactor. As a result of the malfunction/explosion, the impeller shaft, blow bars, and other parts of the machine were cracked or damaged and a metal piece attached to the impeller shaft had broken off. No one was injured in the incident.

There is no indication that Iwata or SSC sought assistance from the manufacturer of the Impactor, Cedarapids, or

3

others in determining the exact cause of the Impactor's malfunction/explosion. The damage to the Impactor was repaired in-house by SCC with the assistance of an outside welder, Gilbert Padamada (Padamada). At Iwata's direction, Padamada welded a metal piece that had broken off back onto the impeller shaft and fixed other cracks in the machine. The welds were not tested by x-ray or any other means, and Iwata did not contact the manufacturer of the Impactor to ask about the proper means of fixing the damage.

Abadilla and other employees were instructed to weld worn locking wedges holding the metal bars in place, rather than replacing them with new locking wedges and bolts. Abadilla warned Iwata that this practice was unsafe. Delbert Cambra (Cambra), a foreman at the company that previously owned the Impactor who had been responsible for its care and maintenance, stated that he would not weld the wedges in place. Cambra explained that welding the wedges in place would limit their usefulness and that the parts being held would probably not "stay tight."

C.

It took several months for the repairs to the Impactor to be completed. The machine was running for about two to three weeks before the incident resulting in injuries to Abadilla occurred. After the Impactor was placed back into service, the Impactor was not running smoothly but would vibrate, and the bearings holding the impeller shaft would run hot. Iwata was aware of this situation. Iwata instructed Abadilla to grease the Impactor every thirty minutes while the machine was running to get a better coverage with the grease, and so that the greasing would not slow down the process of crushing rock. Iwata's instruction was contrary to MSHA regulations, which generally require that maintenance and repair on a machine only be performed after the power is off and the machine blocked against hazardous motion. 30 C.F.R. § 14105 (1999). It was also contrary to the operating manual for the Impactor, which provided

4

that greasing be done every forty-eight hours and warned against over-lubrication because "[t]oo much lubrication will cause abnormally high operating temperatures." Iwata was not aware of these provisions of the MSHA regulations and the operating manual.

On the day that Abadilla was injured, he was greasing the Impactor while it was running in accordance with Iwata's instructions. While Abadilla was engaged in this activity, the Impactor again "exploded" and metal parts from within the Impactor flew outside the machine. Abadilla was hit in the stomach by metal parts or pieces that broke off and were expelled from the Impactor, allegedly causing severe bodily injuries.

Lee, who was working with Abadilla at the time of the accident, observed that the cover to the Impactor had been blown open during the explosion. Metal parts normally attached to the impeller shaft had broken off, and all kinds of metal pieces, including pieces of the blow bars as well as the wedges or chocks, were outside the machine on the ground. Lee concluded that a blow bar that came loose or cracked caused the Impactor to explode, because a metal piece that fell inside the Impactor would cause damage to the machine.

Prior to the explosion that injured Abadilla, one or two of the locks designed to hold the cover to the Impactor in place were missing or broken. According to Abadilla, the explosion which injured him occurred because the parts that had been welded after the prior malfunction incident came apart while the Impactor was running. Adadilla was able to identify areas in which parts had separated from the impeller shaft that corresponded to areas that had been repaired by welding after the previous malfunction/explosion.

II.

Abadilla filed a First Amended Complaint against Iwata and Doe Defendants, alleging five causes of action: (1) Iwata knew or should have known that the Impactor used by Abidilla on property under Iwata's ownership or control was mechanically

unfit for use and unsafe (Count I); (2) Doe Defendants negligently failed to implement adequate safety precautions and properly train employees with respect to heavy machinery and equipment (Count II); (3) Iwata was responsible for supervising Abadilla, inspecting, repairing, and maintaining the Impactor, and ensuring proper safety precautions were followed in repairing, maintaining, and operating the Impactor, and Iwata negligently failed to fulfil these responsibilities (Count III); (4) Iwata was strictly liable for Abadilla's injuries (Count IV); and (5) Iwata engaged in the conduct described in the previous counts recklessly, wantonly, in a manner that was grossly negligent, and with a conscious indifference to Abadilla's safety, thereby justifying the imposition of punitive damages (Count V).

Iwata filed a series of motions for summary judgment which cumulatively sought summary judgment on all the counts alleged against him in the First Amended Complaint. Among other things, Iwata argued that Abadilla's negligence claims against Iwata were barred by Hawai'i's workers' compensation law. In opposing Iwata's motions for summary judgement, Abadilla argued that suits against a co-employee for wilful, wanton, and reckless misconduct were not barred by Hawai'i's workers' compensation law, and that there were genuine issues of material fact concerning whether his injuries were caused by Iwata's wilful, wanton, or reckless misconduct.

The Circuit Court granted summary judgment in favor of Iwata on Counts I, III, IV, and V of the First Amended Complaint. On April 28, 2009, the Circuit Court entered Final Judgment in favor of Iwata and against Abadilla on all claims raised against Iwata in the First Amended Complaint. This appeal followed.

DISCUSSION

I.

On appeal, Abadilla argues that the Circuit Court erred in granting summary judgment in favor of Iwata on Counts I, III,

6

and V of the First Amended Complaint.[2/]   We agree.

We review a trial court's grant or denial of summary judgment de novo, under the same standard applicable to the trial court.  Querubin, 107 Hawai'i at 56, 109 P.3d at 697;  Iddings v. Mee-Lee, 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996).

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Querubin, 107 Hawai'i at 56, 109 P.3d at 697 (brackets and citation omitted).  "[A]ny doubt concerning the propriety of granting the motion should be resolved in favor of the non-moving party."  GECC Fin. Corp. v. Jaffarian, 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995).

## II.

The key issue in this appeal is whether there were genuine issues of material fact concerning whether Abadilla was injured as the result of Iwata's wilful and wanton misconduct.

There is no dispute that Abadilla sustained a work-related injury and that Iwata was Abadilla's co-employee.  Generally, the benefits provided by Hawai'i's workers' compensation law, HRS Chapter 386, is an employee's exclusive remedy for work-related injuries.  Iddings, 82 Hawai'i at 5, 919 P.2d at 267.  HRS § 386-5 (1993) provides, in relevant part, that "[t]he rights and remedies [granted under HRS Chapter 386] to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee[.]"

_____

[2/]   Abadilla does not challenge the entry of judgment against him on Count IV, and we therefore affirm the Final Judgment with respect to that count.  Count II was against Doe defendants and did not pertain to Iwata.

7

In <u>Iddings</u>, the Hawai'i Supreme Court construed HRS § 386-8 (1993)[3/] as extending the employer's immunity from suit to an injured worker's co-employees. <u>Iddings</u>, 82 Hawai'i at 6, 919 P.2d at 268. The supreme court, however, held that HRS § 386-8 also contains an exception to this co-employee immunity for personal injuries caused by a co-employee's "wilful and wanton misconduct." <u>Id.</u> Pursuant to <u>Iddings</u>, HRS §§ 386-5 and 386-8 bar an employee from suing a co-employee for a work-related injury and establishing liability on a theory of negligence, but does not bar suit and establishment of liability on a theory of wilful and wanton misconduct.

The supreme court established the following test for the "wilful and wanton misconduct" exception to co-employee immunity set forth in HRS § 386-8:

> [T]he term "wilful and wanton misconduct," as used in HRS § 386-8, includes conduct that is either: (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril.

<u>Iddings</u>, 82 Hawai'i at 12, 919 P.2d at 174. The court noted that the "wilful and wanton misconduct" exception includes suits based on reckless conduct. <u>Id.</u> It also held that under this exception, a claim based on wilful and wanton misconduct would

---

[3/] HRS § 386-8 provides in pertinent part:

> When a work injury for which compensation is payable under this chapter has been sustained under circumstances creating in some person other than the employer or another employee of the employer acting in the course of his [or her] employment a legal liability to pay damages on account thereof, the injured employee or his [or her] dependents . . . may claim compensation under this chapter and recover damages from such third person.
>
>    . . . .
>
> Another employee of the same employer shall not be relieved of his [or her] liability as a third party, if the personal injury is caused by his [or her] wilful and wanton misconduct.

have to be proven by clear and convincing evidence.  Id. at 14, 919 P.2d at 276.

In Iddings, the supreme court applied its test for the "wilful and wanton misconduct" exception in reviewing the trial court's grant of summary judgment in favor of the defendant, Dr. Mee-Lee.  Iddings, a psychiatric nurse at Castle Medical Center (CMC), suffered injuries when she was shoved against furniture in the Intensive Care Module while subduing a violent patient.  Id. at 4, 919 P.2d at 266.  Iddings sued Dr. Mee-Lee, a co-employee who was in charge of her unit.  Iddings claimed that Dr. Mee-Lee had engaged in wilful and wanton misconduct by allowing "the Intensive Care Module to become overcrowded with patients and furniture, despite being aware of a risk of injury stemming from the alleged overcrowding."  Id.

In opposing Dr. Mee-Lee's motion for summary judgment, Iddings submitted an affidavit which alleged that: (1) Dr. Mee-Lee had been advised over a year prior to Iddings's being injured that Iddings's unit was unsafe due to overcrowding; (2) patients in the Intensive Care Module are frequently violent, and overcrowding increases the danger by raising the likelihood of violent responses among patients and requiring extra furniture to be brought into the unit; (3) prior to being injured, Iddings attended many meetings during which the staff told Dr. Mee-Lee that overcrowding in the unit "presented a dangerous condition to staff working in the unit"; (4) Iddings was aware of approximately ten individuals who were injured within the unit during the six month period before her accident, and she was sure that Dr. Mee-Lee was aware of these incidents because they were discussed at meetings where she and Dr. Mee-Lee were present; and (5) Dr. Mee-Lee exercised control over the number of patients in the unit when it suited his purposes, such as reducing the patient census during a hospital accreditation inspection.  Id. at 20, 919 P.2d at 282.

Based on the allegations made in Iddings's affidavit, the supreme court concluded that:

> there are genuine issues of material fact regarding whether Dr. Mee-Lee engaged in "wilful and wanton misconduct," thereby excepting his conduct from the immunity accorded him against suits by co-employees under HRS § 386-8. Specifically, we believe that there are genuine issues of material fact regarding whether Dr. Mee-Lee's alleged failure to reduce the patient population, and, accordingly, the furniture in the CMC's Intensive Care Module that allegedly caused Iddings's injuries, occurred in circumstances indicating that Dr. Mee-Lee: (1) had knowledge of the risk of injury to CMC staff stemming from the alleged overcrowding; (2) had knowledge that injury was a probable, as opposed to a possible, result of the danger; and (3) consciously failed to avoid the peril.

Id. at 21, 919 P.2d at 283. Accordingly, the supreme court held that the trial court had erred in granting summary judgment in favor of Dr. Mee-Lee. Id.

III.

We conclude that when the evidence is viewed in the light most favorable to Abadilla, there were genuine issues of material fact regarding whether Iwata engaged in wilful and wanton misconduct which caused Abadilla's injuries. Viewing the evidence and the inferences therefrom in this light, there was evidence that Iwata knew, several months before Abadilla sustained his injuries, that the Impactor had malfunctioned and exploded. Iwata was also aware that a malfunction in the Impactor could result in metal parts being expelled from the machine, because during the prior malfunction incident, the cover to the Impactor had been blown open. Despite the significant safety risks presented by another malfunction, Iwata did not consult with the manufacturer of the Impactor regarding the cause of the prior malfunction or the proper method of repairing the damage. Instead, Iwata apparently decided on his own to repair the machine by directing a welder to reattach a metal piece that had broken off of the impeller shaft and to close other cracks in the machine. He also instructed employees to weld worn locking wedges used to hold the metal bars in place, rather than

10

replacing them with new locking wedges and bolts, despite Abadilla's informing him that this practice was unsafe.

Iwata did not have the welds tested before placing the Impactor back into service. He also did not fix one or two of the locks that were or broken or missing, which were among the multiple locks designed to keep the cover of the Impactor in place. Iwata was aware that after the repairs were made, the Impactor was not running smoothly, but was vibrating, and that the bearings were running hot. Contrary to MSHA regulations and the operating manual for the Impactor, Iwata instructed Abadilla to grease the Impactor every thirty minutes while the machine was running to avoid slowing down production. Iwata failed to familiarize himself with the pertinent MSHA regulations or provisions of the operating manual before giving these instructions.

Abadilla was injured when the Impactor malfunctioned and exploded and metal parts from the Impactor were expelled from the machine and struck him in the stomach. At the time of his injury, Abadilla was greasing the Impactor while it was running pursuant to Iwata's instructions. The prior malfunction incident was very similar to the incident which injured Abadilla. Both incidents apparently resulted from metal parts within the Impactor detaching from the machine while it was running, causing the machine to "explode" and the cover to the Impactor to be blown open. The damage to the Impactor was similar in both incidents. The same metal pieces that had come apart and had been welded back after the prior malfunction incident were found to have come apart in the incident that caused injuries to Abadilla.

Based on this evidence, we conclude that there were genuine issues of material fact regarding whether Iwata: (1) had knowledge of the risk of injury to Abadilla stemming from the alleged improper repair and maintenance of the Impactor and the alleged improper instruction to Abadilla to grease the machine while it was running; (2) had knowledge that injury was a

probable, as opposed to a possible, result of the danger; and (3) consciously failed to avoid the peril. See Iddings, 82 Hawai'i at 21, 919 P.2d at 283. Therefore, there were genuine issues of material fact regarding whether Iwata engaged in wilful and wanton misconduct. Based on the similarity between the prior malfunction incident and the incident which caused Abadilla's injuries, we further conclude that there were genuine issues of material fact concerning whether Iwata's wilful and wanton misconduct caused Abadilla's injuries. Because of the existence of these genuine issues of material fact, the Circuit Court erred in granting summary judgment in favor of Iwata on Counts I and III.

IV.

In Iddings, the supreme court observed that while the standards are not identical, "tortious conduct meriting the imposition of punitive damages and tortious conduct falling within the exception to co-employee immunity in HRS § 386-8 are measured by similar terms[.]" Id. at 9 n.6, 919 F.2d at 271 n.6. To recover punitive damages,

> [t]he plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

Masaki v. General Motors Corp., 71 Haw. 1, 16-17, 780 P.2d 566, 575 (1989).

Based on our analysis that there were genuine issues of material fact regarding whether Iwata engaged in wilful and wanton misconduct which caused Abadilla's injuries, we conclude that there were also genuine issues of material fact regarding Abadilla's claim for punitive damages. Accordingly, we conclude that the Circuit Court erred in granting summary judgment in favor of Iwata on Count V.

CONCLUSION

The co-employee immunity set forth in HRS § 386-8 protects Iwata from liability based on a theory of negligence, but not from liability based on wilful or wanton misconduct. We vacate the Final Judgment with respect to the entry of judgment on Counts I, III, and V of the First Amended Complaint in favor of Iwata and against Abadilla, and we remand the case for further proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawai'i, January 31, 2013.

Steven K. Hisaka
(Janice T. Futa,
Dwayne S. Lerma, and
Jo Anne E. Goya, with him
on the briefs)
for Plaintiff-Appellant

Gregory K. Markham
(Keith K. Kato, with him on
the brief)
for Defendant-Appellee

Chief Judge

Associate Judge

Associate Judge

13